Filed 2/13/24  Cambareri v. Apple CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| LINDA CAMBARERI,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>APPLE INC., et al.,<br><br>    Defendants and Respondents. | H050641<br>(Santa Clara County<br>Super. Ct. No. 18CV333345) |

Plaintiff Linda Cambareri sued Apple Inc. and one of its subsidiaries, FileMaker, Inc. (Defendants), for employment discrimination and retaliation under the Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.), harassment, unpaid wages, and wrongful termination.  After the trial court sustained without leave to amend Defendants' demurrer to the causes of action for harassment and wrongful termination, Defendants moved for summary judgment and summary adjudication on the remaining claims.  The trial court granted the motion and entered judgment in favor of Defendants.

In this appeal, Cambareri challenges the trial court's summary judgment in favor of Apple on all claims, and the summary adjudication of her discrimination, retaliation and unpaid wages claims.  Our de novo review produces a mixed result.  Summary judgment in favor of Apple was appropriate, as was summary adjudication of the unpaid wages claim.  However, we find that summary adjudication was improperly granted as to Cambareri's discrimination and retaliation claims against FileMaker.  We will therefore reverse the judgment and remand the matter for further proceedings in the trial court.

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

FileMaker is a "workplace innovation platform that enables users to create and run custom applications to store information, manage projects, and track assets, among other functions, across iPad, iPhone, Windows, Mac, and the internet." Although FileMaker has been a wholly-owned subsidiary of Apple since 1987, it registers as a separate corporate entity with the California Secretary of State. Cambareri began working as an inside sales representative at FileMaker on December 4, 2006.

### A. Events Between 2008 and 2012

According to Defendants, Cambareri had a documented history of problematic workplace behavior between 2008 and 2012. In her 2008 performance review, Cambareri's manager, Mike Alvarado, wrote that Cambareri "is a hard worker who comes to work with selling on her mind," but "makes a difficult job more difficult and at times unpleasant for not only herself but also those around her." As feedback, one of her coworkers wrote: "[Cambareri] has been the most difficult team member that I have encountered while at FileMaker. She is very negative and her strong personality does not allow for open communication. [Cambareri] does not accept responsibility, but rather passes blame for poor performance. I have not seen her act in the best interest of other team members, nor follow any consistent sales process." Another coworker wrote: "Linda is prevented from being more successful by her aggression."

In her 2009 performance review, Alvarado noted that Cambareri needed to "[c]orrect behaviors that are not in the best interest of the Company or your team." Cambareri responded in the "employee's comments" section, writing: "I believe that I

---

[1] "The determinative question in an appeal from a summary judgment is whether there are any material facts in dispute." (*King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 430 (*King*).) Accordingly, we recite in this section the undisputed facts from Defendants' perspective as the moving parties. In our discussion of the causes of action, we will present facts that create triable issues from Cambareri's perspective.

needed improvement as far as vocalizing my dissatisfaction with certain things and I have improved."

For Cambareri's 2009 mid-year evaluation, Alvarado wrote the following under the topic "Teamwork": "[Cambareri] works well with her teammates. However, one area of concern is [Cambareri's] tendency to share her dissatisfaction with a situation or a decision. Some of [Cambareri's] peers have commented on this behavior. No one expects complete agreement and sometimes decisions don't go the desired way; however, excessive venting causes distractions, dissension and perceptions of unprofessional behavior."

In Cambareri's 2010 performance review, Alvarado wrote that Cambareri "often creates an unproductive work environment by demonstrating a lack of respect for teammates, sales processes and/or procedures that she does not agree with." Alvarado also wrote that while Cambareri "has solid technical expertise and often exceeds her metrics and results, her workplace behavior and failure to work and communicate effectively with her teammates . . . overshadow her positive contributions and impede her success." Cambareri responded to these comments by writing: "The categories that I was unsatisfactory on are superficially plausible but wrong . . . . Who is the senior representative I am supposed to respect? . . . I was very open to getting some ideas on how to be even more successful and possibly some constructive criticism on how better to do my job. This review is neither."

FileMaker issued a documented coaching to Cambareri in October 2010, which outlined areas where Cambareri "need[ed] to immediately improve [her] performance." The documented coaching included the following statement under the heading "Teamwork": "[Cambareri] consistently voices her displeasure of others on and around the Sales floor. [Cambareri] has alienated and had a demoralizing impact on the Americas Sales team to the extent that most if not all of the Business Account Managers or Inside Sales Representatives have raised concerns about working with her or having

3

her on their team." It also included a description of Cambareri's communication style as "often abrasive, overly direct, confrontational and critical," and noted that "[r]ather than raising her issues to Sales Management and/or HR and discussing them in private, she often raises them openly on the sales floor." FileMaker notified Cambareri in the documented coaching that "[f]ailure to show immediate significant improvement or failure to successfully complete the objectives above may result in termination of your employment," and "[r]ecurrence of the same or other performance issues after completion of this action may result in termination without further coaching or notice."

In 2012, Alvarado spoke with Cambareri "regarding [her] conduct on the sales floor . . . as well as statements made by a few teammates regarding the implications and use of the word liar" directed at Alvarado. Cambareri told Alvarado she was discussing someone else and did not refer to him as a liar. Alvarado noted this was "not the first incident of this nature and it cannot continue," and reminded Cambareri he had previously spoken to her about "professional behaviors/conduct" and had given her "guidance on how to [appropriately] . . . vent or express [her] dissatisfaction." Alvarado reiterated that conversations unrelated to work should be conducted away from the sales floor.

### B.  Events Between 2014 and June 2015

On November 19, 2014, Cambareri sent an e-mail to Ryan McCann, a senior sales director, entitled "Keep doing the right thing." At that time, Cambareri's direct manager was Jill Horn, a female employee over 40 years old. Cambareri wrote that Horn told her to call leads and not to e-mail them. She continued: "Really? I only do that when I get 200 in 2 days because of [*sic*] someone else flicked [*sic*] up.[¶]  I am really trying to have a good attitude, did not last too long . . . .[¶] I will just keep being the worker bee. I am not letting anyone beat me this quarter. I will just focus on that." Cambareri also copied into the e-mail an article entitled "How to Lose a Great Employee in 10 Ways." In

4

reference to the article, Cambareri wrote she sent the article to McCann "to keep doing what you are doing and not forget why people worked hard for you."

On January 15, 2015, Horn issued a final warning to Cambareri. The final warning stated: "On January 7, 2015, new Territory assignments were sent out to the Americas Sales team via email. You immediately went to Ryan McCann's cubicle and in a loud voice exclaimed, 'What the fuck?' because the territory assignments were not what you had expected. Several people in this open cubicle area heard your outburst. At the conclusion of your rant, Ryan asked if you wanted to talk about it and you said 'not really' and walked away." The final warning also discussed a meeting that occurred on December 2, 2014, during which Cambareri said she "did not think that any time should be spent following up with leads," which "created an awkward environment in that meeting." After the first meeting, "Brad [Freitag][2] called the [team] back into another meeting and stated . . . calling Leads is an important part of the job. During this meeting, you challenged Brad and demanded that he do the math related to how many leads you could call each day in addition to other administrative tasks." In conclusion, the final warning stated: "As a result of your unprofessional and inappropriate workplace behavior, you are being issued this Final Warning. Any further inappropriate workplace conduct will result in further disciplinary action, up to and including immediate termination of your employment."

After the January 15 incident, Cambareri took a four-day "cooling off period" away from the office. On January 16, 2015, Cambareri e-mailed Ben Cottarel, another manager, with a "[r]ebuttal." Cambareri wrote that she "was being retaliated against because my management thought I went to Bill and Dave."[3] Cambareri explained that she was "walking by Bill Epling's office and he called me in and Bill and Dave Williams

---

[2] Freitag was the vice president of sales at FileMaker.
[3] Bill Epling was FileMaker's CFO, and Dave Williams reported to Epling.

asked if I could discuss my take on leads with them. Of course I said yes. I answered truthfully and accurately based on my extensive experience and success here." She continued: "[A]fter my meeting with Bill and Dave[,] Jill called me into a meeting. That is where she was hostile and accused me of 'running to Bill and Dave.' " Cambareri also indicated that Freitag had mentioned she "went to Bill and Dave" during the meeting on December 2, and she realized she was being "singled out and treated hostile because of it."

Cambareri expressed in her e-mail to Cottarel that she was "concerned that they are threatening my job in retaliation. I am also concerned that they have fired employees that were women and over 40." Cambareri had "overheard others . . . mention that [Horn] said she wants to 'fire people' and it was said on the sales floor. I am sure that demoralized some. I have heard numerous disgruntled comments from others here . . . and I did not run to management."

Chazz Pono, a human resources manager, met with Cambareri about her e-mail. After the meeting, Pono sent an e-mail to Cambareri stating: "As we discussed, here is the name and contact info for Mike Gillaspie, in Corporate Employee Relations . . . . I want to reiterate that if you need an independent person to speak to regarding your concerns, Mike is an alternative person you should feel free to contact." Cambareri did not reach out to Gillaspie.

FileMaker transferred Cambareri to another team under Cottarel's supervision. In June 2015, Cottarel and McCann worked together to complete Cambareri's performance review for that fiscal year. Under "Teamwork," they rated Cambareri as "Expected more." Cottarel and McCann wrote the following in the narrative portion of the "Teamwork" section: "Needless to say, this was a difficult year for [Cambareri] relative to office interactions. During the middle of the fiscal year, [Cambareri] was put on a final written notice as a result of ongoing conflict and distraction . . . . [¶]Although

6

[Cambareri] has improved in this area, from time-to-time her emotions get the best of her, which can lead to heated exchanges in the office." FileMaker gave Cambareri a raise.

### C. October 2015

On October 13, 2015, Cambareri interrupted a meeting between Cottarel and McCann to dispute a sales credit awarded to another employee. McCann thought Cambareri's tone was disrespectful and "overly aggressive." McCann asked Cottarel to take Cambareri for a walk around the building to calm down.

Later that day, Pono told Cambareri to leave the office and placed her on paid leave "while FileMaker investigated the incident." Pono spoke with Cambareri on October 15, 2015, to obtain her version of what occurred.

On October 20, 2015, while still on paid leave, Cambareri met with Nannette Rowley, a senior employee relations consultant with Apple, at a coffee shop. At the time of the meeting, FileMaker had not reached a decision regarding Cambareri's employment. Cambareri told Rowley she was thinking about resigning and asked if she could receive a severance package. According to Rowley, Cambareri agreed her resignation would be effective on October 23, 2015.

Rowley e-mailed the severance agreement to Cambareri on October 21, 2015. Cambareri responded by e-mail on October 23, 2015, writing that she mailed back her work phone and asked about her final paycheck and commission payments. Cambareri never returned to FileMaker and her employment ended on October 23, 2015.

### D. Relevant Procedural Background

Cambareri filed a first amended complaint (FAC) in October 2019 alleging four causes of action against Defendants: (1) discrimination and harassment in violation of FEHA; (2) retaliation in violation of FEHA; (3) unpaid wages; and (4) wrongful termination. After the trial court sustained without leave to amend Defendants' demurrer to the causes of action for harassment and wrongful termination, Defendants filed an answer.

7

On September 13, 2021, Defendants filed a motion for summary judgment or, in the alternative, summary adjudication, which Cambareri opposed. The trial court granted Defendants' motion, but the judge who originally heard the matter later disqualified himself and vacated the order. A second judge re-heard Defendants' motion and granted it. A judgment in favor of Defendants was entered on October 11, 2022. Cambareri timely appealed.

## II. LEGAL PRINCIPLES AND STANDARD OF REVIEW

Motions for summary judgment and summary adjudication are procedurally identical. (*Dunn v. County of Santa Barbara* (2006) 135 Cal.App.4th 1281, 1290 (*Dunn*).) Their purpose "is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 (*Aguilar*).)

A motion for summary judgment "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).)[4] "Summary adjudication is warranted only if the motion completely disposes of a cause of action, an affirmative defense, a claim for damages, or an issue of duty." (*Dunn, supra*, 135 Cal.App.4th at p. 1290.) Like the trial court, we must " 'consider all of the evidence' and 'all' of the 'inferences' reasonably drawn therefrom [citation], and must view such evidence [citations] and such inferences [citations], in the light most favorable to the opposing party.' " (*Aguilar, supra*, 25 Cal.4th at p. 843; cf. *Scheer v. Regents of the Univ. of Cal.* (2022) 76 Cal.App.5th 904, 913 (*Scheer*) [appellate court assumes role of trial court and applies same rules and standards governing summary judgment].) "[W]e liberally construe plaintiffs' evidentiary submissions and strictly scrutinize defendants'

---

[4] All further unspecified statutory references are to the Code of Civil Procedure.

own evidence, in order to resolve any evidentiary doubts or ambiguities in plaintiffs' favor." (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142 (*Wiener*).) "There is a genuine issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Serri v. Santa Clara Univ.* (2014) 226 Cal.App.4th 830, 860 (*Serri*).)

" ' "We review orders granting summary judgment or summary adjudication de novo. [Citations.]" ' " (*Magic Carpet Ride LLC v. Rugger Investment Group, L.L.C.* (2019) 41 Cal.App.5th 357, 362.) In doing so, " '[w]e determine whether the court's ruling was correct, not its reasons or rationale.' " (*Scheer, supra,* 76 Cal.App.5th at p. 913.) We "must affirm on any ground supported by the record." (*Jimenez v. County of Los Angeles* (2005) 130 Cal.App.4th 133, 140.)

### III. DISCUSSION

#### A. Trial Court's Order

We first address Cambareri's argument that the trial court failed to comply with section 437c, subdivision (g), which requires that an order granting summary judgment or adjudication contain the reasons for the determination and "specifically refer to the evidence proffered in support of and . . . in opposition to the motion that indicates no triable issues exists." (§ 437c, subd. (g).) In its order granting Defendants' motion, the trial court cited "the declarations of Evan Pierce, Ryan McCann, Nanette Rowley and Michael Leggieri" as the evidence supporting its decision rather than identifying specific portions of those declarations or the attached exhibits. Cambareri claims prejudice from the trial court's citation to entire declarations because she was "left to guess which portions of the evidence [Defendants] produced supported the court's conclusions."

However, reversal is not required simply because an order granting summary judgment does not comply with section 437c, subdivision (g). (*Santa Barbara Pistachio Ranch v. Chowchilla Water Dist.* (2001) 88 Cal.App.4th 439, 448 (*Santa Barbara*).)

9

"The de novo standard for appellate review of an order granting summary judgment frequently means the lack of a proper order constitutes harmless error." (*Main Street Plaza v. Cartwright & Main, LLC* (2011) 194 Cal.App.4th 1044, 1057.) A trial court's failure to state its reasons is pertinent only if it causes prejudice to the aggrieved party on appeal. (See *Santa Barbara* at pp. 448-449.) For example, in *Taswell v. Regents of the University of California* (2018) 23 Cal.App.5th 343 (*Taswell*), the appellate court declined to find the plaintiff forfeited an argument by not raising it in his opening brief because the trial court's order did not comply with section 437c, subdivision (g). (*Id.* at pp. 363-364.) The court reasoned that because the trial court did not clearly present an alternative basis for granting summary judgment in its order, the plaintiff was not adequately prompted to address this dispositive issue in his appellate briefing. (*Ibid*.)

Here, Cambareri does not risk forfeiting her challenge on appeal due to the trial court's general reference to the evidence. In contrast to *Taswell*, the order in this case sufficiently notified Cambareri of the reasons why the court granted summary judgment and summary adjudication; for each issue and each cause of action it addressed, the trial court concluded that Cambareri did not raise a triable issue of material fact in response to the declarations submitted by Defendants. No alternative basis for granting the motion is discussed or even mentioned, and Defendants do not raise any on appeal or argue for forfeiture. Thus, we find that Cambareri was not prejudiced by manner in which the trial court stated its reasons and cited the evidence supporting its decision to grant Defendants' motion.

### B. Joint Employers

We turn to Cambareri's contention that the trial court erred by granting summary judgment to Apple based on its determination that Apple was not her employer, either jointly with FileMaker or as FileMaker's corporate parent. In their motion, Defendants contested the FAC's allegations on that issue, relying on several items of evidence. Defendants submitted declarations from Evan Pierce, a "People Business Partner" for

10

Apple, and McCann. Pierce reviewed information regarding the corporate structures of Apple and FileMaker. He determined that while FileMaker was a wholly-owned subsidiary of Apple, the companies registered as separate corporate entities with the California Secretary of State and had different corporate officers and executive offices. Pierce reviewed payroll records for FileMaker and Apple, which showed that FileMaker, not Apple, issued paychecks to Cambareri from December 2006 through October 23, 2015, and issued form W-2 statements to Cambareri for 2014 and 2015. In FileMaker's personnel records, Pierce found that Cambareri, Horn, McCann, Pono and Cottarel were each listed as current or former FileMaker employees and were never registered as Apple employees.

McCann stated that no one at Apple "exercised day-to-day control" over the FileMaker sales team or over Cambareri specifically, and that "no one at Apple made decisions regarding the work assignments of Cambareri." McCann stated further that all of the individuals who supervised Cambareri were FileMaker employees, not Apple employees.

Defendants produced Cambareri's 2006 employment application and offer letter, both of which identified FileMaker and not Apple as the employer, and documents showing that Cambareri named FileMaker as her former employer after her separation. Defendants also submitted the portion of Cambareri's deposition where she agreed that FileMaker's office was her only work location.

Cambareri responded in her declaration by stating that she and other FileMaker employees "were all led to believe" by Apple and FileMaker that they were Apple employees. She pointed out that her offer letter noted she would receive employment benefits from Apple and could participate in the Apple employee stock purchase plan, and Cambareri remembered receiving paychecks bearing Apple's name but no longer had them. Cambareri's badge allowed access to Apple's main campus and amenities such as the café and fitness center, and Cambareri was gifted Apple-branded products.

11

Cambareri's 2015 performance review had an Apple logo on it and she was given an Apple confidentiality agreement.

Cambareri provided her personal observations about the business relationship between Apple and FileMaker. She surmised that the sales teams for the two companies worked together "to leverage Apple's name and resources to boost sales" of FileMaker's product, and that there was an "interrelation of Apple and FileMaker operations, common management, centralized control of labor relations, and common ownership or financial control by Apple over FileMaker." Cambareri also stated that Defendants "lured employees to FileMaker with the promise of employment and benefits of working for Apple."

In concluding that Apple was entitled to summary judgment because it was not Cambareri's employer, the trial court determined that Apple's evidence was "more than sufficient" under the "integrated enterprise[s]" test[5] to show it was not liable as FileMaker's corporate parent. As to whether Apple was Cambareri's joint employer with FileMaker, the trial court found that "[e]ven if the FAC could be reasonably interpreted as alleging that Apple and FileMaker were 'joint employers' (and it cannot be), Apple would still be entitled to summary judgment on the basis that it was not [Cambareri's] employer."

On appeal, Cambareri focuses only on whether Apple and FileMaker were joint employers. Therefore, Cambareri has abandoned the issue of whether Apple is liable as FileMaker's parent, and we limit our discussion accordingly. (*Limon v. Circle K Stores,*

---

[5] Under the "integrated enterprise[s]" test, a parent corporation and its subsidiary can be considered a single employer under FEHA based on four factors: interrelation of operations, common management, centralized control of labor relations, and common ownership or financial control. (*Laird v. Capital Cities/ABC, Inc.* (1998) 68 Cal.App.4th 727, 738 (*Laird*).)

12

*Inc.* (2022) 84 Cal.App.5th 671, 687 [issues not raised in appellant's brief are deemed abandoned].)

FEHA "predicates potential 'liability on the status of the defendant as an "employer" ' " and the existence of " 'some connection with an employment relationship,' although this connection 'need not necessarily be direct.' " (*Vernon v. State of California* (2004) 116 Cal.App.4th 114, 123 (*Vernon*).) Consequently, more than one individual, company or organization may qualify as an individual's "employer," depending on the " 'totality of circumstances' that reflect upon the nature of the work relationship of the parties." (*Id.* at pp. 124-125; accord *Bradley v. Dept. of Corrections & Rehabilitation* (2008) 158 Cal.App.4th 1612, 1626 (*Bradley*) [no "magic formula" exists to determine whether an organization qualifies as an employer, but the "prevailing view is to consider the totality of the circumstances"]; *Laird, supra,* 68 Cal.App.4th at p. 737 [recognizing that two corporations may be treated as a single employer under FEHA]; *Mathieu v. Norrell Corp.* (2004) 115 Cal.App.4th 1174, 1183 [labor law doctrine of "dual employers" applies to FEHA claims].)

In *Vernon*, the court listed several factors to consider when assessing whether a joint employment relationship exists, including the "payment of salary or other employment benefits and Social Security taxes, the ownership of the equipment necessary to performance of the job, the location where the work is performed, the obligation of the defendant to train the employee, the authority of the defendant to hire, transfer, promote, discipline or discharge the employee, the authority to establish work schedules and assignments, the defendant's discretion to determine the amount of compensation earned by the employee, the skill required of the work performed and the extent to which it is done under the direction of a supervisor, whether the work is part of the defendant's regular business operations, the skill required in the particular occupation, the duration of the relationship of the parties, and the duration of the plaintiff's employment." (*Vernon, supra*, 116 Cal.App.4th at p. 125.) These factors

13

" ' "cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations." ' " (*Ibid.*)

" 'Of these factors, the extent of the defendant's right to control the means and manner of the workers' performance is the most important.' [Citations.] In all cases, an 'employer must be an individual or entity who extends a certain degree of control over the plaintiff.' " (*Vernon, supra*, 116 Cal.App.4th at p. 126.) This control must be "significant," and " ' there must be a "sufficient indicia of an interrelationship . . . to justify the belief on the part of an aggrieved employee that the [alleged co-employer] is jointly responsible for the acts of the immediate employer." ' " (*Ibid.*) In other words, "we look ' "to the degree an entity or person significantly affects access to employment" ' " when determining employer liability under FEHA. (*Ibid.*)

Defendants argue, as the trial court found, that the FAC cannot be interpreted to allege that Apple and FileMaker were Cambareri's joint employers. We recognize that "the burden of a defendant moving for summary judgment only requires that he or she negate plaintiff's theories of liability *as alleged in the complaint*; that is, a moving party need not refute liability on some theoretical possibility not included in the pleadings." (*Hutton v. Fidelity Nat. Title Co.* (2013) 213 Cal.App.4th 486, 493 (*Hutton*).) But here, a fair reading of the FAC's allegations reveals that Apple's potential liability for Cambareri's claims was not based solely on its position as FileMaker's parent. Although Cambareri recited in the FAC the elements of the test commonly used to determine whether a subsidiary and its parent are one employer for FEHA claims, she also expressly clarified that she was "not seeking to impose liability on [Apple] merely because FileMaker was a subsidiary or merely because of the acts of FileMaker." Cambareri indicated "that Apple was her employer" after it acquired FileMaker and alleged other facts relevant to determining whether a joint employment relationship existed under the *Vernon* factors, such as her receipt of paychecks and other employment documents and benefits from Apple and her ability to use access Apple's campus. Thus, we find the

14

FAC sufficient to "put a reasonable defendant on notice" of the theory that Apple was Cambareri's joint employer. (*Jacobs v. Coldwell Banker Residential Brokerage Co.* (2017) 14 Cal.App.5th 438, 444.)

That said, Cambareri did not raise a triable issue of fact as to this theory. Defendants produced evidence showing that Apple did not control Cambareri's assignments, her sales team or her working conditions. This evidence was uncontroverted, and Cambareri concedes in her opening brief that Defendants' evidence "affirmed that no one at Apple exercised day-to-day control over the FileMaker sales team." While not conclusive, the absence of evidence demonstrating that Apple exercised any control over Cambareri's work—the "most important" factor under *Vernon*—is a strong indication that an employment relationship did not exist. (*Vernon, supra*, 116 Cal.App.4th at p. 126; see *Bradley, supra*, 158 Cal.App.4th at p. 1625 [employer's exercise of direction and control over employee's work is "the keystone of the employment relationship"].)

For other *Vernon* factors, Defendants showed that FileMaker, not Apple, issued Cambareri's paychecks throughout her period of employment and issued her W-2 statements for the last two years of her employment. Defendants also produced Cambareri's application and offer letter, neither of which referenced Apple, and showed, through Cambareri's deposition testimony, that Cambareri only worked from FileMaker's offices.

Cambareri argues other evidence proves that Apple was "intimately involved in setting the terms and conditions" of her employment. To that end, she cites her allegations that FileMaker led her and others to believe they were Apple employees and used Apple's name recognition as a recruitment and promotional tool. But similar claims were considered and rejected in *Laird*. There, the plaintiff was hired by a subsidiary corporation, but stated she was always told she was an employee of the parent corporation. (*Laird, supra*, 68 Cal.App.4th at p. 739.) She also claimed that the parent

15

organization took credit for the subsidiary's operations in dealing with the public because the parent's name " 'held more clout.' " (*Id*. at p. 740.) The *Laird* court held these facts failed to establish that the parent corporation had any involvement in the subsidiary's day-to-day operations or employment decisions. (*Id*. at pp. 740-741.) We reach the same conclusion here.

As for Cambareri's assertions that FileMaker employees had other connections to Apple, these facts, without more, only show that Apple had some nominal or passive involvement in FileMaker's affairs rather than any significant control over Cambareri's work. (*Vernon, supra*, 116 Cal.App.4th at p. 126; *Laird, supra*, 68 Cal.App.4th at p. 739; *Frank v. U.S. West, Inc.* (10th Cir. 1993) 3 F.3d 1357, 1363 ["broad, general policies" are not evidence of day-to-day control over employment decisions].) Moreover, outside of declaring it, Cambareri did not provide any facts showing that FileMaker and Apple had shared management or common employees. While some minor degree of interrelation is suggested by the fact that Rowley, an Apple human resources employee, met with Cambareri while she was on paid leave, there is no evidence that Rowley had any authority over Cambareri's employment status.

Considering the totality of circumstances, we find that no trier of fact could reasonably conclude Apple was Cambareri's joint employer with FileMaker for her FEHA claims. We also find that no trier of fact could reasonably conclude that Apple was Cambareri's joint employer for the unpaid commissions claim. The test used to determine whether an employer-employee relationship exists under the Labor Code wage statutes contemplates factors comparable to those considered for joint employment under FEHA. (*Taylor v. Financial Casualty & Surety, Inc.* (2021) 67 Cal.App.5th 966, 985 (*Taylor*).) "To employ . . . has three alternative definitions. It means: (a) to exercise control over the wages, hours or working conditions, or (b) to suffer or permit to work, or (c) to engage, thereby creating a common law employment relationship." (*Martinez v. Combs* (2010) 49 Cal.4th 35, 64 (*Martinez*).) Only the first and third definitions, both of

16

which focus on an employer's control over the employee, could apply here.[6] (*Taylor,* at p. 992 [' "essence" ' of common law employment relationship is principal's right to control manner and means of employee's work].)  As we have explained, Cambareri's evidence did not raise a triable issue as to Apple's lack of control over Cambareri's wages or working conditions.

Therefore, we conclude that the trial court correctly found that Apple was entitled to summary judgment.

### C. *Discrimination and Retaliation*

We next address Cambareri's argument that the court erred by granting summary adjudication to FileMaker on her causes of action for discrimination and retaliation. FEHA prohibits an employer from, among other things, discriminating against an employee because of their age or gender.  (§ 12940, subd. (a).)  FEHA also protects employees against retaliation for opposing conduct made unlawful under its provisions. (*Id.,* subd. (h).)  "The express purposes of FEHA are 'to provide effective remedies that will both prevent and deter unlawful employment practices and redress the adverse effects of those practices on aggrieved persons.'  (§ 12920.5.)  The Legislature accordingly has mandated that the provisions of the statute 'shall be construed liberally' to accomplish its purposes.  (§ 12993, subd. (a).)"  (*Soria v. Univision Radio Los Angeles, Inc.* (2016) 5 Cal.App.5th 570, 583 (*Soria*).)

In an employment discrimination case, an employer moving for summary judgment "has the initial burden to present admissible evidence showing either that one or more elements of plaintiff's prima facie case is lacking or that the adverse employment action was based upon legitimate, nondiscriminatory [or nonretaliatory] factors."  (*Hicks*

---

[6] A proprietor "suffers" or permits work when he or she knows "that persons are working in his or her business without having been formally hired, or while being paid less than the minimum wage," but having the power to do so fails to prevent it. (*Martinez, supra*, 49 Cal.4th at p. 69.)

17

*v. KNTV Television, Inc.* (2008) 160 Cal.App.4th 994, 1003 (*Hicks*).) If the employer meets this burden by proffering legitimate reasons, the employee must then produce "substantial evidence" that the employer's proffered legitimate factors were untrue or pretextual, or that the employer acted with discriminatory or retaliatory animus. (*Ibid.*) "It is not sufficient for an employee to make a bare prima facie showing or to simply deny the credibility of the employer's witnesses or to speculate as to discriminatory motive." (*Serri, supra*, 226 Cal.App.4th at p. 862.) " ' "If the employer presents admissible evidence either that one or more of plaintiff's prima facie elements is lacking, or that the adverse employment action was based on legitimate, nondiscriminatory factors, the employer will be entitled to summary judgment *unless the plaintiff produces admissible evidence which raises a triable issue of fact material to the defendant's showing.*" ' " (*Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327, 344 (*Arteaga*).)

### 1. *Prima Facie Case*

Cambareri alleged Defendants discriminated against her because of her age and gender and retaliated against her for opposing discrimination. At trial, Cambareri would have the burden of proving a prima facie case of discrimination by showing (1) she was a member of a protected class (i.e., over 40 and female), (2) she was performing her job competently, (3) she suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) "some other circumstance suggest[s] discriminatory motive." (*Guz v. Bechtel National, Inc.*(2000) 24 Cal.4th 317, 355; accord *Khoiny v. Dignity Health* (2022) 76 Cal.App.5th 390, 397 (*Khoiny*).) To prove retaliation, Cambareri would have the burden to show (1) she engaged in protected activity, (2) she suffered an adverse employment action, and (3) a causal link existed between the protected activity and her termination. (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042 (*Yanowitz*).)

The trial court implied that Cambareri could not state a prima facie case of discrimination because she was "bound by her verified responses to requests for

18

admissions . . . stating that she did not know who replaced her or what 'his or her' age was." To the extent the trial court believed Cambareri was required to show she was replaced by an employee outside of her protected class in order to state a prima face case, it was mistaken. In *Heard v. Lockheed Missiles & Space Co.* (1996) 44 Cal.App.4th 1735 (*Heard*), this court held that such evidence may be relevant, but was not required. (*Id*. at p. 1755.) "Although proof regarding similarly situated employees outside the protected class may be one way of raising an inference of intentional discrimination, *it is not the only way*." (*Ibid*.) Defendants do not argue otherwise. Following *Heard*, we find that Cambareri's discovery response does not negate her ability to show a prima facie face of discrimination.

### 2. Adverse Employment Action

Defendants argued in their motion that Cambareri could not show that she suffered an adverse employment action because undisputed evidence established that Cambareri voluntarily resigned. The trial court determined that a triable issue of fact existed as to this issue. On appeal, Defendants argue the trial court erred and renew their contention that Cambareri voluntarily resigned. Reviewing the record de novo, we agree with the trial court.

"[I]n order to establish either a discrimination or a retaliation claim, 'an employee must demonstrate that he or she has been subjected to an adverse employment action that materially affects the terms, conditions, or privileges of employment' " (*Jones v. Lodge at Torrey Pines Partnership* (2008) 42 Cal.4th 1158, 1168.) Termination is an adverse employment action. (*Khoiny, supra*, 76 Cal.App.5th at p. 397.) Voluntary resignation is not. (*Featherstone v. Southern Cal. Permanente Medical Group* (2017) 10 Cal.App.5th 1150, 1163.)

Here, the evidence showed that Cambareri did not return to FileMaker's office after she was placed on paid leave on October 13, 2015. Undisputed evidence also showed that Rowley emailed a severance agreement to Cambareri after their meeting on

19

October 20, 2015, and Cambareri's last day of employment was October 23, 2015. However, all of the other details surrounding Cambareri's separation were disputed. Cambareri denied ever signing the severance agreement, and Defendants did not produce a signed agreement or show that Cambareri accepted any severance benefits. Cambareri stated in her declaration she was "told to go home" and never asked to come back, and disputed Rowley's representations that she asked for a severance package and agreed to resign during their meeting. Cambareri believed she was fired but "just wasn't told so," and "never said [she] was resigning." This evidence raised a factual disagreement about whether Cambareri was terminated or voluntarily resigned that could not be resolved on summary judgment. Therefore, the trial court correctly determined there was a triable issue as to whether Cambareri was subjected to an adverse employment action.

### 3. *Legitimate Reason*

Although the trial court rejected Defendants' argument that Cambareri could not show an adverse employment action, it nonetheless granted summary adjudication on the claims for discrimination and retaliation. The trial court found that Defendants satisfied their burden to establish a legitimate, nondiscriminatory and nonretaliatory reason for terminating Cambareri, and that Cambareri's evidence did not raise a triable issue that her termination stemmed from unlawful discrimination or retaliation.

Cambareri argues that Defendants did not meet their initial burden. She asserted in her opposition to Defendants' motion that Defendants failed to offer any evidence of a legitimate reason for her termination. As she put it, Defendants did not "even admit they terminated [Cambareri] and have not offered any admissible evidence at all by a witness that they did so and had good reason for it." Cambareri repeats a version of this argument in her appellate briefing, contending that because Defendants denied she was fired, they could not have a legitimate reason for doing so. She also claims "[t]here is no evidence from [Defendants] asserting that any action[] or series of actions by Cambareri were fire-able offenses," that the trial court "never truly analyzed this issue," and that the

20

court erred by making an "unwarranted assumption" that Cambareri committed offenses justifying her termination without "sworn testimony."

We disagree with Cambareri's contentions for several reasons. First, our independent review of the record reveals that Defendants made a " 'sufficient showing of a legitimate reason for discharge.' " (*Hanson v. Lucky Stores, Inc.* (1999) 74 Cal.App.4th 215, 225.) Defendants produced evidence establishing that Cambareri had a history of problematic workplace behavior culminating in a conflict with McCann over a sales credit. (*Guz, supra*, 24 Cal.4th at p. 358 [legitimate reasons are "*facially unrelated to prohibited bias*, and which, if true, would thus preclude a finding *of discrimination*"].) Despite the implication in Cambareri's argument, there is no requirement under FEHA that an employer cite "fire-able" conduct for its reasons to be considered legitimate in this context. Rather, an employer may fire an employee " 'for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.' " (*Arteaga, supra*, 163 Cal.App.4th at p. 344.)

Second, Defendants are not required at this stage to produce evidence showing that the legitimate reason they proffered was the actual reason Cambareri was terminated. Cambareri implies such an obligation exists, claiming that Defendants could not demonstrate a legitimate reason because McCann "did not believe that her actions justified termination, as he never made a decision to fire her, and did not state in his declaration supporting summary judgment that she had been terminated." But the employer's burden to provide a legitimate reason is one of production, not persuasion. (*Abed v. Western Dental Services, Inc.* (2018) 23 Cal.App.5th 726, 736.) The employer " ' "need not persuade the court that it was actually motivated by the proffered reasons. . . It is sufficient if the [employer's] evidence raises a genuine issue of fact as to whether it discriminated against the [employee]." ' " (*Caldwell v. Paramount Unified School Dist.* (1995) 41 Cal.App.4th 189, 201; cf. *Guz, supra*, 24 Cal.4th at p. 356 ["The

21

ultimate burden of persuasion on the issue of actual discrimination remains with the plaintiff."].)

Third, we reject the suggestion that Defendants must admit Cambareri was terminated before their proffered reasons for doing so can be considered. Cambareri argues that Defendants cannot "have it both ways, on the one hand claiming that Cambareri was not fired, while arguing on the other hand that the firing was justified," and contends her opposition to Defendants' motion "could have consisted of a single page pointing out the logical fallacies in [Defendants'] 'we could have fired her but we didn't' defense." However, as we have explained, an employer can approach summary judgment in two ways: (1) by demonstrating that the employee cannot prove one or more elements of a prima facie case, or (2) by articulating legitimate reasons for an adverse employment action. (*Hicks, supra*, 160 Cal.App.4th at p. 1003.) These approaches are not mutually exclusive, and "logical fallacies" fatal to summary judgment are not created when both are directed to the same cause of action and the first approach fails. Since evidentiary doubts are resolved in the non-moving party's favor, any elements of a prima facie case challenged under the first approach that present triable issues of material fact are then presumed true for the analysis of the employer's legitimate reasons under the second approach. (See *Wiener, supra*, 32 Cal.4th at p. 1142; *Sheffield v. Los Angeles County Dept. of Social Services* (2003) 109 Cal.App.4th 153, 159 [when reviewing summary judgment motion, non-moving party's version of disputed facts is assumed correct].) Having determined there is a triable issue as to whether Cambareri was subjected to an adverse employment action, we presume, as did the trial court, that Cambareri was terminated for the purpose of this analysis.

In sum, Defendants satisfied their burden to produce admissible evidence that FileMaker terminated Cambareri for a reason that is factually unrelated to prohibited bias or retaliation.

22

#### *4. Pretext and Discriminatory Animus*

The burden shifts to Cambareri to "offer substantial evidence that the employer's stated nondiscriminatory reason for the adverse action was untrue of pretextual, or evidence the employer acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination." (*Hersant v. Dept of Social Services* (1997) 57 Cal.App.4th 997, 1004-1005 (*Hersant*).) Although we "liberally construe" Cambareri's showing, her evidence "remains subject to careful scrutiny." (*King, supra*, 152 Cal.App.4th at p. 433.) In order to demonstrate a triable issue of material fact, the "evidence must relate to the motivation of the decision makers to prove, by nonspeculative evidence, an actual causal link between prohibited motivation and termination." (*Id.* at pp. 433-434.)

Citing *Hersant*, Cambareri argues she can demonstrate discriminatory or retaliatory animus sufficient to satisfy her burden merely by showing that Defendants proffered reasons for terminating her were untrue. She asserts "evidence that the employer's asserted reasons for an adverse employment action were untrue may, *in itself*, show discriminatory or retaliatory animus, and evidence of other discriminatory or retaliatory conduct will support the same conclusion." However, Cambareri does not accurately capture the conclusion reached by the *Hersant* court. There, after noting that "[t]he exact showing required by an employee to avoid summary judgment" is a matter of disagreement, the *Hersant* court determined "[i]t is not enough for the employee simply to raise triable issues of fact concerning whether the employer's reasons for taking the adverse action were sound." (*Hersant, supra*, 57 Cal.App.4th at p. 1005.) " '[T]he factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.' " (*Ibid*.)

Since *Hersant*, other courts have clarified that "[t]he employee must do more than raise an issue whether the employer's action was unfair, unsound, wrong or mistaken, because the overriding issue is whether discriminatory animus motivated the employer."

23

(*Johnson v. United Cerebral Palsy/Spastic Children's Foundation* (2009) 173 Cal.App.4th 740, 755 (*Johnson*).)  "[O]ne cannot reasonably draw an inference of intentional discrimination solely from evidence that an employer lied about its reasons for taking an adverse employment action.  'The pertinent statutes do not prohibit lying, they prohibit discrimination.'  [Citation.]  While a circumstantial case of discrimination may be ' "considerably assist[ed]" ' by proof that the employer's stated reasons are not worthy of belief 'because it suggests the employer had cause to hide its true reasons,' '[s]till, there must be evidence supporting a rational inference that intentional discrimination, on grounds prohibited by the statute, was the true cause of the employer's actions.' " (*Id.* at p. 758.)

Cambareri also takes the position that "very little evidence" was needed in response to Defendants' initial showing to defeat the motion.  Whether Cambareri is correct depends on the type of evidence she presented.  Circumstantial evidence of pretext must be " 'specific' " and " 'substantial' " in order to create a triable issue with respect to whether the employer discriminated or retaliated against the employee for improper reasons.  (*Zamora v. Security Industry Specialists, Inc.* (2021) 71 Cal.App.5th 1, 34, 36 (*Zamora*).)  But if the employee produces direct evidence of pretext, a triable issue is raised even if the evidence is not substantial.  (*Ibid.*)  " ' "[V]ery little" direct evidence of the employer's discriminatory intent' " is needed to move past summary judgment.  (*Ibid.*)  However, "direct evidence of intentional discrimination is rare, and . . . such claims must usually be proved circumstantially." (*Guz, supra*, 24 Cal.4th at p. 354.)

*Schnidrig v. Columbia Machine* (9th Cir. 1996) 80 F.3d 1406 (*Schnidrig*) is a case involving direct evidence of discrimination.  The company's directors told the plaintiff, who was in his sixties, that the board wanted to promote a "younger man for the job" or someone "in the 45-50 year old range," and a director told another employee the board was not considering the plaintiff because "they wanted someone in his or her mid to late

24

forties." (*Id*. at p. 1408.) The plaintiff also produced shorthand notes from a board meeting during which one director suggested including "age 45-50 years" as a requirement in materials sent to an executive search firm. (*Ibid*.) On the plaintiff's appeal from an order granting summary judgment, the court found that the plaintiff "clearly established a prima facie case of age discrimination" not through "the factors giving rise to a presumption of discrimination" but through "direct evidence of discriminatory motives." (*Id*. at p. 1409.)

Cambareri did not argue there was direct evidence of discrimination and retaliation before the trial court. On appeal, she claims the following constituted direct evidence: (1) McCann used "sexist" language in reference to Cambareri by calling her "overly aggressive," "emotional," "assertive," and "difficult," and said she let "her emotions get the best of her;" (2) McCann criticized Cambareri for using coarse language even though he used similar language in the workplace; (3) McCann downgraded Cambareri's review after she complained to Cottarel that McCann was retaliating against her and firing older women; (4) McCann took away one of Cambareri's sales credits and awarded it to a younger man; (5) McCann excused members of his purported "boys club" from certain work requirements but disciplined older female employees for not satisfying those requirements; and (6) McCann fired or forced out nine female and two male employees who were over 40 years old.

This is not direct evidence. Unlike *Schnidrig*, where the evidence established a direct connection between the plaintiff's age and the employer's decision not to promote him, the evidence Cambareri cites provides no such direct connection between her termination and her age, gender or purported protected activity. The six facts that Cambareri describes are at best circumstantial, requiring us to infer from the evidence that FileMaker had a discriminatory or retaliatory motive. (See *Ajaxo Inc. v. E\*Trade Group Inc.* (2005) 135 Cal.App.4th 21, 50 ["When an inference needs to be drawn from the evidence to prove a fact, we call this circumstantial evidence as opposed to direct

25

evidence."].) Thus, Cambareri's evidence of pretext must be "specific" and "substantial" to overcome Defendants' motion. (*Zamora, supra*, 71 Cal.App.5th at p. 34.)

### i.    *Evidence of Pretext for Discrimination*

We now examine Cambareri's evidence, having clarified the lens by which we analyze pretext. Cambareri stated in her declaration[7] that shortly before Horn and McCann became her managers in November 2014, McCann asked Cambareri about her age during a meeting. When Cambareri said she was "52 or 53," she noticed that McCann made a "funny look." Cambareri described McCann as "well under the age of 40" and "part of the male-young culture . . . where older women were not valued the same as men." She believed McCann's demeanor was "highly suggestive" of someone who "valued his trusted (and seemingly always male) 'young guns' " who were part of what Cambareri believed was a " 'boys club,' " and she was "aware that two male account executives younger than 40, who were hired and lived with [] McCann, had violated company policies and procedures and had unsuccessful sales performance quotas and yet they were still employed . . . and given preferential treatment." Cambareri named

---

[7] Defendants objected to nearly every paragraph of Cambareri's declaration, but the trial court declined to rule on the objections. "Because the trial court here did not sustain any of the objections, let alone make any evidentiary rulings, it was required by section 437c, subdivision (c) to consider all of [Cambareri's] evidence." (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 534.) We must also consider " 'all of the evidence set forth in the [moving and opposition] papers except that to which objections have been made *and sustained*.' " (*Ibid.*)

Contrary to statements made by Defendants' counsel at oral argument, Defendants did not renew any of the evidentiary objections in their responding brief in a manner that would permit appellate review. (See Cal. Rules of Court, rule 8.204(a)(1)(B) [party is required in appellate brief to "[s]tate each point under a separate heading or subheading summarizing the point, and support each point by argument and, if possible, by citation of authority"]; see also *Pizarro v. Reynoso* (2017) 10 Cal.App.5th 172, 179 ["Failure to provide proper headings forfeits issues that may be discussed in the brief but are not clearly identified by a heading."].) Accordingly, we may consider the evidence in Cambareri's declaration in deciding this appeal.

26

Mick Kleinick and Anthony McPherson as members of McCann's " 'boys club' " who "were not at their desk or making lead calls," and stated that Shane Comet "was caught lying on his time-card and not terminated but Debbie Wright, a woman over 40, was terminated, allegedly for that reason." Cambareri also identified nine other women over 40 years old who were fired under McCann.

Cambareri contested the version of events recounted in the final warning issued by Horn in January 2015. In contrast to what Horn wrote, Cambareri stated she "did not yell" at McCann after she received the new territory assignments and "there was no outburst," and McCann "expressed no concerns" about Cambareri approaching him. Although Cambareri said " 'what the fuck,' " she said it in low voice so that others would not hear her. Cambareri did not believe it was unusual to use coarse language with McCann because they "both had gutter mouths" in prior interactions and other employees "on the sales floor swore all of the time." During a second meeting that same day, Cambareri stated that McCann "exploded" and threatened to terminate her, referring to her as a " 'cancer to the organization.' " After Cambareri left FileMaker, she had a conversation with Horn through the website LinkedIn, during which Horn wrote that Cambareri was a "terrific inside sales person," and that Horn was " 'egged on' " and " 'pushed' " by McCann to " 'respond/talk the way [she] did.' "

Cambareri stated that Cottarel told her he was instructed by McCann to downgrade her 2015 performance review. In June, Cottarel wrote in the " 'results' " section of the review that Cambareri "exceeded expectat[ions]" and awarded her a 3 percent raise. In September, Cottarel changed the rating to "expected more" and reduced Cambareri's raise from 3 percent to 1.5 percent. As for her earlier performance reviews, Cambareri stated the negative comments made by her supervisors and colleagues were belied by the positive performance reviews and raises she received in subsequent years, and by the absence of any disciplinary action against Cambareri from 2010 through 2014.

27

Regarding the incident on October 13, 2015, Cambareri explained she approached McCann to "plead [her] case" after the sales credit was awarded to a younger male employee. In contrast to McCann's description, Cambareri said she was not disrespectful and aggressive but that McCann "was extremely combative," "overreacting," and hostile toward her. Cambareri had documentation to support her position that the sales credit was hers, but she was told to leave before she could present it.

Pretext may be inferred from the timing of a termination decision, the identity of the person making the decision, and by the employee's performance before termination. (*Soria, supra*, 5 Cal.App.5th at p. 594.) Also, as we have explained, proof that the employer's stated reasons are not worthy of belief can " ' "considerably assist[]" ' " a circumstantial showing. (*Johnson, supra*, 173 Cal.App.4th at p. 758; accord *Soria, supra*, at p. 594 [pretext may be demonstrated by showing proffered reason had no basis in fact, proffered reason did not actually motivate the discharge, or proffered reason was insufficient to motivate discharge]; *Hersant, supra*, 57 Cal.App.4th at p. 1005 [pretext can be shown by " 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action' " that a reasonable factfinder could infer employer did not act for non-discriminatory reasons].) We review Cambareri's evidence as a whole, not in fragments. (*Zamora, supra*, 71 Cal.App.5th at p. 59; accord *Yanowitz, supra*, 36 Cal.4th at p. 1056 [allegations of retaliation should be considered collectively].) "Where the employee presents several matters 'which *by themselves* will not constitute substantial evidence that [the employer's] stated reason for firing [the employee] was pretextual or that [the employer] acted with a discriminatory animus' when it took adverse action against the employee, the court must consider 'whether these matters, *when taken together,* do constitute sufficient evidence to demonstrate a triable issue of fact.' " (*Zamora, supra*, at pp. 59-60.)

28

In our view, the evidence advanced by Cambareri, when considered as a whole, was sufficient to raise a triable issue as to whether Defendants' reason for terminating Cambareri was a pretext for discrimination. First, the evidence concerning Cambareri's workplace behavior was, at best, inconsistent. (See *Johnson, supra*, 173 Cal.App.4th at p. 759 [" 'inconsistencies in performance evaluations prior and subsequent to an employee's termination may support an inference of pretext' "].) Most of the negative performance reviews on which Defendants relied to show that Cambareri engaged in disruptive and unprofessional conduct were from 2008, 2009 and 2010. There is no evidence showing that Cambareri received any negative performance reviews between 2011 and 2014, even though Alvarado counseled Cambareri about her behavior in 2012. Cambareri did not begin receiving negative feedback again until January 2015, which is shortly after McCann learned Cambareri's age and became her second-level supervisor. Also, despite the earlier criticisms of Cambareri and her protest over new territory assignments in January 2015, Cottarel still gave her a positive performance review six months later, until he was instructed by McCann to downgrade it.

Second, there was conflicting evidence concerning the events in 2015 that preceded Cambareri's separation from FileMaker. Defendants relied heavily on the exchanges between Cambareri and McCann in January and October to justify their termination decision. But the only declarations from individuals who personally witnessed these events were from Cambareri and McCann, each of whom provided a distinctly different perspective on what occurred. In McCann's version, Cambareri was rude and aggressive whereas in Cambareri's version, her behavior was appropriate, controlled and typical. Of course, it is not our role in reviewing an order granting summary adjudication to decide whether Cambareri or McCann is more credible. (*Carr v. City of Newport Beach* (2023) 94 Cal.App.5th 1199, 1204 [court analyzing summary judgment motion does not make credibility determinations, weigh evidence or resolve factual disputes].) But liberally construing the evidence in Cambareri's favor, as we

29

must, we find that a jury could reasonably conclude that these incidents did not actually motivate the discharge.

The same can be said about the final warning that Horn issued in January 2015, only days after the interaction between Cambareri and McCann about the territory assignments. Since there is no evidence that Horn personally observed that exchange, the reliability of at least that portion of the warning is intertwined with McCann's credibility. Furthermore, the fact that Cambareri was not disciplined for using coarse language with McCann until the warning suggests it was not a problem until after McCann learned Cambareri's age. And on a broader note, Horn's subsequent admission that she was "egged on" and "pushed" by McCann to criticize Cambareri raises the inference that Horn disagreed that the final warning was justified.

Third, the contextual evidence is pertinent. We must accept as true Cambareri's personal observations of McCann's demeanor, his alleged treatment of favored male employees, and the "male-young" culture in the workplace, as well as Cambareri's contention that other female employees over 40 years old were fired.[8] (See *Sada v. Robert F. Kennedy Medical Center* (1997) 56 Cal.App.4th 138, 148 ["the facts alleged in the evidence of the party opposing summary judgment . . . must be accepted as true"].) We have also considered McCann's descriptions of Cambareri as "aggressive," "assertive," "strong," and "difficult," and that she let "her emotions get the best of her." These remarks could be classified as instances of sex stereotyping, which "can certainly

---

[8] Defendants submitted additional evidence with their reply papers in response to Cambareri's assertions on these topics. The trial court did not consider the additional evidence. Because they do not argue that this decision was an abuse of discretion by the trial court, we decline Defendants' request to consider the additional evidence for the first time on appeal. (See *Grappo v. McMills* (2017) 11 Cal.App.5th 996, 1009,[trial courts have discretion whether to "accept arguments or evidence made for the first time in reply"]; *Plenger v. Alza Corp.* (1992) 11 Cal.App.4th 349, 362, fn. 8 ["inclusion of [] evidentiary matter with the reply should only be allowed in the exceptional case"].)

30

be *evidence* that gender played a part" in an employer's decisions. (*Price Waterhouse v. Hopkins* (1989) 490 U.S. 228, 251.) The "all too familiar complaints about assertive, strong women who speak up for themselves" is "oft employed rhetoric that could reveal illegitimate motives." (*Stegall v. Citadel Broad. Co.* (9th Cir. 2003) 350 F.3d 1061, 1072.)

The trial court discounted Cambareri's declaration, finding it "self-serving and speculative regarding the supposedly discriminatory motivations of her supervisors in their dealings with her." It is true that a " 'plaintiff's subjective beliefs in an employment discrimination case do not create a genuine issue of fact; nor do uncorroborated and self-serving declarations." (*King, supra*, 152 Cal.App.4th at p. 433.) Also, the trial court may properly disregard a declaration that "purports to impeach his or her own prior sworn testimony" provided during discovery. (*Scalf v. D.B. Log Homes, Inc.* (2005) 128 Cal.App.4th 1510, 1522; see *Thompson v. Williams* (1989) 211 Cal.App.3d 566, 573 ["a party cannot rely on contradictions in his own testimony to create a triable issue of fact"].) We recognize that Cambareri's 46-page, 140-paragraph declaration was meandering and replete with rhetorical questions, conjecture about the motivations of others, assertions based on rumor, and inadmissible legal conclusions, all of which made it an arduous task to discern the legitimate factual allegations from material that could be appropriately disregarded. We do not condone this manner of haphazardly presenting evidence in opposition to summary judgment. At the same time, evidence demonstrating genuine issues of dispute that does not otherwise contradict a party's verified discovery responses or deposition testimony cannot be disregarded merely because it is presented in a self-serving way. (*Scalf, supra*, at p. 1524-1525.) As we have described, Cambareri included facts in her declaration describing her experience in the workplace and the incidents leading up to her termination that were based on her personal knowledge and participation. This type of evidence is appropriate to consider when analyzing a motion for summary judgment. (See § 437c, subd. (d).) Aside from one assertion that the trial

31

court found contradicted Cambareri's deposition testimony, it should not have entirely dismissed the remainder of the declaration as self-serving or speculative.[9]

Taken together, this evidence—the inconsistent performance reviews, the resurgence of criticisms against Cambareri after McCann learned of her age, the contradictions in the testimony, the adverse actions against other employees in Cambareri's protected class, the work environment at FileMaker, and McCann's use of stereotyped language—constitutes specific and substantial evidence of discriminatory animus toward Cambareri that raised a triable issue regarding the reason underlying her termination. Therefore, summary adjudication of Cambareri's discrimination claim must be reversed.

### ii. *Evidence of Pretext for Retaliation*

We also review the evidence of retaliation collectively. (*Light v. Dept. of Parks & Recreation* (2017) 14 Cal.App.5th 75, 92.) "When a plaintiff alleges a series of actions that comprise a course of conduct, we need not examine each individually. Instead, we consider the totality of the circumstances to determine whether the plaintiff has suffered an adverse employment action." (*Ibid*.) "[T]here is no requirement that an employer's retaliatory acts constitute one swift blow, rather than a series of subtle, yet damaging, injuries." (*Yanowitz, supra*, 36 Cal.4th at p. 1055.)

Viewing the evidence in the light most favorable to Cambareri, we conclude that she has raised a triable issue as to whether she was terminated following complaints about discriminatory and retaliatory conduct at FileMaker. The evidence shows that after Cambareri sent her "rebuttal" e-mail to Cottarel and met with Pono about the e-mail, three notable events occurred: her performance review was downgraded at McCann's

---

[9] Although the parties disagree whether the trial court properly disregarded Cambareri's assertion in her declaration identifying the employee who replaced her, we need not address the issue because that fact is not material to our resolution of this appeal.

instruction, McCann reassigned a sales credit from Cambareri to another employee, and Cambareri was placed on leave. Additionally, Cambareri states in her declaration that after she reported discriminatory treatment by McCann to Pono again on October 15, 2015, she was terminated. A jury could reasonably infer from this evidence that McCann engaged in a course of retaliatory conduct against Cambareri that started with the change to her performance review and ended with her termination.

In its analysis of Cambareri's retaliation claim, the trial court determined her January 16 e-mail did not constitute protected activity because "she was not protesting activity that could reasonably be considered unlawful discrimination." It appears to have reached this conclusion based on a selected passage from *Yanowitz*, where the Supreme Court declared that "complaints about personal grievances or vague or conclusory remarks that fail to put an employer on notice as to what conduct it should investigate will not suffice to establish protected conduct." (*Yanowitz, supra*, 36 Cal.4th at p. 1047.) The *Yanowitz* court made that statement in analyzing whether the plaintiff had engaged in protected activity when she repeatedly refused to carry out a supervisor's order to terminate a female employee because of her physical appearance, but never complained about the supervisor's conduct to human resources or anyone else at the company. (*Id.* at p. 1048.) The court held that the plaintiff had engaged in protected activity because her "refusal to implement the order, coupled with her multiple requests for 'adequate justification,' sufficiently communicated" that she believed the order was discriminatory. (*Ibid*.)

Unlike the subtle protestation of the supervisor's order at issue in *Yanowitz*, Cambareri directly referenced in her January 16 e-mail a concern about discrimination against employees like herself: females over the age of 40. Cambareri also directly addressed alleged discrimination in her conversation with Pono immediately before she was terminated. According to her declaration, Cambareri told Pono she suspected she was being "set up for an unlawful termination and/or retaliated against on the basis of my

33

age and/or gender or both." These statements were explicit references to allegedly unlawful conduct, not personal grievances or vague or conclusory remarks. And given our discussion of Cambareri's discrimination claim, we cannot find it unreasonable for Cambareri to have believed she was opposing improper activity. (See *Yanowitz, supra*, 36 Cal.4th at p. 1043 ["retaliation claim may be brought by an employee who has complained of or opposed conduct that the employee reasonably believes to be discriminatory"].)

Defendants argue, and the trial court also found, that Cambareri failed to establish a causal link between any protected activity and an adverse employment action. Defendants first contend that because the " 'expected more' " rating from Cambareri's 2015 review was based on the final warning issued the day before Cambareri's e-mail, any connection between the e-mail and the review is "temporally impossible." We disagree. As a matter of timing, the review was drafted after Cambareri's e-mail; McCann stated he and Cottarel completed the review "[o]n or around June 1, 2015." Furthermore, the evidence cited by Defendants does not confirm that the " 'expected more' " rating was based solely on the final warning. Instead, McCann stated that the review "took into account" the warning. But even if the review was based only on the final warning, we have already explained that the accuracy of the information contained in the warning was subject to legitimate factual dispute.

Second, Defendants assert that awarding the sales credit to an employee other than Cambareri was not a retaliatory act because Cambareri presented no evidence she was entitled to the credit. Again, we disagree. In her declaration, Cambareri stated the following regarding the disputed sales credit: "In my note in Salesforce . . . I had written something like 'Tom Cotton is the next office that will be purchasing' which is part of House of Representatives organization, which made this clearly an existing account of mine per Apple rules and my compensation contract." Defendants offered no evidence to

34

contradict this assessment, other than McCann's statement that it was the sales manager "who decided, based on the situation, who should get the credit."

Third, Defendants contend that Cambareri failed to produce evidence, outside of her "self-serving" declaration, to support the allegation that she complained to Pono about McCann's treatment while on leave. They further argue that the content of the conversation is irrelevant because "the disciplinary process was already underway before this conversation took place." We have found, however, that the facts alleged in Cambareri's declaration—especially those involving actions she took or conversations she had—cannot be disregarded as self-serving. In her declaration, Cambareri stated that during her conversation with Pono, she related her impression that she was being "set up" for termination or retaliation because of her age, gender, or both. This conversation is not irrelevant due to the disciplinary process that had commenced by that time since, according to Rowley, FileMaker had not yet reached a decision regarding Cambareri's employment when they met on October 20, 2015.

Finally, Defendants argue the "temporal proximity" between Cambareri's January 2015 e-mail and termination defeats her retaliation claim because Cambareri sent the e-mail more than nine months before her employment ended. Defendants claim this period of time renders the termination "too remote" to create a causal connection. In general, "temporal proximity alone is not sufficient to raise a triable issue as to pretext once the employer has offered evidence of a legitimate, nondiscriminatory reason for the termination." (*Arteaga, supra*, 163 Cal.App.4th at p. 353.) However, temporal proximity is a relevant factor that, along with other evidence, can be sufficient to establish pretext. (*Id*. at p. 354.) Here, a jury could reasonably find that Cambareri's termination was the conclusion to a series of retaliatory acts, the first of which—a downgraded performance review—occurred approximately five months after the January 16 e-mail. This is well within the timeframe that can raise an inference of retaliation. (See *Flores v. City of*

*Westminster* (9th Cir. 2017) 873 F.3d 739, 750 [three-to-eight months is time range that can support an inference of retaliation].)

We find that Cambareri presented sufficient evidence to raise a triable issue of fact as to whether her termination was the result of retaliation. Therefore, the summary adjudication of the retaliation claim must be reversed.

### D. Unpaid Wages

We finally address Cambareri's argument that summary adjudication should not have been granted on her unpaid wages claim. In the FAC, Cambareri alleged that Defendants violated Labor Code section 221 by failing to pay her the total amount of sales commissions she was owed under the sales incentive compensation plan in effect in October 2015.

Labor Code section 221 makes it " 'unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee.' " "[S]ales commissions are considered 'wages.' " (*Sciborski v. Pacific Bell Directory* (2012) 205 Cal.App.4th 1152, 1166.) "Generally, the right to a commission depends on the terms of the parties' contract." (*Ibid*.) " ' "A commission is 'earned' when the employee has perfected the right to payment; that is, when all of the *legal* conditions precedent have been met. Such conditions precedent are a matter of contract between the employer and employee, subject to various limitations imposed by common law or statute." ' " (*Koehl v. Verio, Inc.* (2006) 142 Cal.App.4th 1313, 1335 (*Koehl*).)

In their motion, Defendants produced a copy of the sale incentive compensation plan. As relevant here, the plan provided for participants to earn commissions based on progress against a quarterly "target." The plan administrator communicated to each participant their "target" through an incentive compensation statement and target summary report. The plan stated that "[u]nder certain circumstances," a participant's target could be prorated by the plan administrator, "subject to the approval of FileMaker Sales Management and Finance." Under the section entitled "Termination of

36

Employment from a Commissionable Position," the plan stated: "Incentive Compensation will be paid only on Incentive Compensation earned during the Participant's employment up to the Participant's date of termination from FileMaker, unless otherwise required by local law." According to Cambareri's Incentive Compensation Statement and Target Summary Report, her quarterly target was $636,483. If she attained 69.9 percent or less of her target, the plan provided a quarterly commission payment of "$71.90 per 1% of attainment up to 69.9%." Payments increased if Cambareri attained 70 percent to 100 percent of her target, and increased again if she attained over 100 percent. The report also included the following statement: "Actual pay may differ depending on actual achievement, or other factors, and will be pro-rated based on the Effective Date if applicable."

McCann stated in his declaration that Cambareri's quarterly attainment before termination was $148,038, or 23.3 percent of her quarterly target, and that FileMaker paid Cambareri commissions based on that attainment. Reviewing this evidence, the trial court found that the plan did not require FileMaker to prorate her quarterly target and that Cambareri was paid the commissions she was owed.

We agree with the trial court. None of the provisions of the plan or target summary report provide that Cambareri's quarterly target would be automatically prorated or reduced at separation from employment, which would have to occur before Cambareri could possibly be owed additional compensation under the plan's terms. Instead, both the plan and the report noted that proration *might* occur, not that it *would* occur. The plan stated that a prorated target may be assigned "[u]nder certain circumstances" and "subject to the approval of FileMaker Sales Management and Finance." Similarly, the report stated that a payment may be prorated "based on the Effective Date if applicable." Cambareri did not produce any evidence demonstrating that she was assigned a prorated target before she was terminated, or that she was owed additional commissions due to an applicable "effective date." In other words, Cambareri

37

did not demonstrate she had " 'perfected the right to payment' " under the terms of the plan. (*Koehl, supra*, 142 Cal.App.4th at p. 1335.) Thus, the trial court correctly found there was no triable issue as to Cambareri's unpaid wages claim.[10]

## IV. DISPOSITION

The judgment is reversed, and the matter is remanded to the trial court for further proceedings. The trial court is ordered to vacate its order on the motion for summary judgment, or, in the alternative, summary adjudication, and to enter a new order (1) granting summary judgment to Apple, (2) granting summary adjudication as to the unpaid wages claim, and (3) denying summary adjudication as to the discrimination and retaliation claims against FileMaker. The parties are to bear their own costs on appeal.

---

[10] Cambareri also argues, in relation to the unpaid wages claim, that FileMaker "wrongfully reduced her commission below the 70% rate by awarding one of her sales to a younger male employee." We do not consider this argument because, as the trial court found, the FAC's allegations only assert a failure to pay commissions according to the language of the plan. (*Hutton, supra*, 213 Cal.App.4th at p. 493.)

_____
ADAMS, J.*

WE CONCUR:

_____
DANNER, ACTING P.J.

_____
WILSON, J.

*Cambareri v. Apple, Inc., et al.*
H050641

---

* Judge of the Santa Clara County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.